UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re:  GREGORY BENJAMIN | : | |
| SCHEFFLER, | : | Case No. 09-22088REF |
| Debtor | : | Chapter 7 |

---------------------------------------------

| | | |
|---|---|---|
| ROBERT H. HOLBER, Trustee, | : | |
| Plaintiff | : | |
| v. | : | Adv. No. 09-2177 |
| M&T BANK and PENN | : | |
| GRAPHICS EQUIPMENT, INC., | : | |
| Defendants | : | |

# MEMORANDUM OPINION

# I.  INTRODUCTION

With all due respect for the excellent lawyers involved in this litigation, I suggest that they missed the real issues central to this dispute.  They were correct to argue that the issue of reasonably equivalent value is important in this fraudulent transfer case.  But the timing of the relevant events belies the parties' narrow focus on the value of a certain technology as the key to resolving the Trustee's claim.

# II. SUMMARY OF DECISION

Debtor voluntarily assumed certain debt of his family's business, Defendant Penn Graphics Equipment, Inc. ("PGE"). Debtor's responsibility for the debt was assumed at about the same time as PGE's permission for Debtor, and later Debtor's start-up company, Scheffler Automated Systems, Inc. ("SAS"), to use certain technology that Debtor had created as an employee of PGE. PGE had incurred substantial debt and had used substantial capital to develop the technology for a new product line. The new product line proved seriously unprofitable and was a significant financial drain on PGE's successful, core business.

Debtor broke away from the family business in Spring/Summer 2006, with the blessing of his family, and began operating as a sole proprietorship to manufacture the new product line. Debtor later formed SAS[1] to conduct the business. Debtor felt morally responsible for having caused the financial difficulties of PGE, arising from the development of the technology for the manufacture of a new product line that failed miserably. When Debtor left PGE, therefore, he agreed to owe it $400,000, representing an estimate of the cost to PGE

---

[1] Debtor incorporated SAS in August 2006, as a Sub-Chapter S corporation, intending it to develop and sell certain specialty equipment with Debtor as its only shareholder. SAS ceased operations in January 2009. Joint Pretrial Statement, filed June 3, 2011, Statement of Uncontested Facts, Part II, ("Joint Statement") ¶¶ 13-15. Unless noted to the contrary, reference to the Joint Statement refers to its Part II.

of developing the failed product line. Unfortunately, neither PGE nor Debtor nor SAS could develop and produce the new product line in a way that came even remotely close to break-even.

A year after Debtor's spin-off from PGE, in Spring 2007, he guaranteed two loans made by Defendant M&T Bank ("M&T") to PGE in the aggregate amount of $650,000. Debtor secured his guaranties to M&T with two mortgages (in the amounts of $250,000 and $400,000) on his residence. Debtor also paid to PGE the monthly payments of the debt service on the $400,000 loan. The stated purpose of the $650,000 M&T loans to PGE was to pay down PGE's line of credit in an amount a bit over $147,000. PGE had opened and drawn on that line of credit to develop the new technology.

A family trust held title to Debtor's residence at 78 Stone Road, Lot 3, Hamburg, Pennsylvania (the "Home") before the Spring 2007 M&T loans and mortgages attached. In April 2007, the trust accelerated its previously promised conveyance of title for the Home to Debtor shortly before the two M&T loans were booked. Shortly after the trust conveyed title in the Home to Debtor, he mortgaged his Home to secure the two M&T loans.

The sole defense advanced by Defendants is that Debtor received reasonably equivalent value for the two M&T mortgages because PGE allowed

Debtor and his company SAS to use the new technology. Although I find and

conclude that the technology provided to Debtor did not constitute reasonably

equivalent value compared to the mortgages and although I will rule against

Defendants on that basis, I also find and conclude that the technology was given to

Debtor a full year before the two M&T mortgages were recorded against his Home.

The technology, whatever its value might be, was not given to Debtor in exchange

for the mortgages. I therefore reviewed other assets that Debtor might have

received in Spring 2007. I find and conclude that Debtor received nothing of

significant (and certainly not reasonably equivalent) value for taking on the two

M&T mortgages.

The Opinion below contains my findings and conclusions, on the basis

of which I will enter judgment in favor of Plaintiff Trustee and against Defendant

M&T on Counts I and II and I will avoid the M&T mortgages encumbering

Debtor's Home. As discussed more fully below, and as I did with Defendant PGE,

I find in favor of Defendant M&T and against Plaintiff Trustee on Count III[2] and I

will enter judgment for M&T on Count III.

---

[2] Trustee's failure to prove the value of Debtor's Home in April 2007 requires that I enter
judgment in favor of Defendant M&T on Count III.

# III.  BACKGROUND

## A.  PROCEDURAL BACKGROUND

The procedural background of this matter is unremarkable.  On August 14, 2009, Debtor filed his petition for relief pursuant to Chapter 7 of the Bankruptcy Code.  Debtor owns his Home, which is valued by agreement at $350,000.[3]  Debtor identified three mortgages and a number of delinquent real estate taxes, totaling $775,898.41, that encumber his Home.  Debtor owes the three mortgage debts (listed by priority), first, to Bank of America in the amount of $148,556.16 ("BoA First Mortgage"), second, to M&T in the amount of $252,273.29 ("M&T Second Mortgage"), and third, to M&T in the amount of $365,068.82 ("M&T Third Mortgage").[4]

On December 29, 2009, the Chapter 7 Trustee initiated the above-captioned adversary proceeding by filing his complaint against Defendants.

---

[3] Joint Statement, ¶ 11.

[4] Joint Statement, ¶¶ 6, 10, & 11.
Debtor failed to identify, as a lien against his Home, a judgment that was entered in Berks County against Debtor and in favor of Manufacturers and Traders Trust Company in the amount of $77,931.20 at docket number 09-5526 (Berks County Court of Common Pleas) on May 6, 2009.  The judgment creditor's name, Manufacturers and Traders Trust Company, is another name of Defendant M&T.  See Exhibits T-9 and T-11, which are the M&T mortgages at issue in this case, both of which are in the name of Manufacturers and Traders Trust Company.  Debtor immediately moved to avoid this lien as impairing his exemption pursuant to Section 522(f) of the Bankruptcy Code.  Through my Order dated September 23, 2009, I granted Debtor's unopposed motion to avoid the judgment lien.

Trustee's Counts I and II of this adversary proceeding against M&T seek to avoid

as fraudulent transfers the two M&T mortgages on Debtor's Home. Trustee

brought Count III against both M&T and PGE[5] for recovery of the equity value of

Debtor's Home lost pursuant to the M&T mortgages.

The parties attempted mediation for a few months, but it proved

unsuccessful. Pre-trial procedures, discovery, and dispositive motions extended

through 2010. On January 7, 2011, I entered two Orders. The first denied M&T's

motion for summary judgment;[6] the second denied M&T's motion in limine

seeking to exclude Plaintiff's expert witness.[7] The parties tried this dispute on two

trial dates, September 7 and 8, 2011. The Trustee filed his post-trial brief in early

October 2011[8] and Defendants filed their post-trial briefs by the end of October

2011.

To some extent during argument at the close of the trial on September

---

[5] Count III is the only count that names PGE as a defendant.

[6] M&T's summary judgment motion relied entirely on the valuation of the technology, which was an open factual issue that clearly precluded summary judgment.

[7] I denied M&T's motion in limine, because I found that M&T's objections to Trustee's anticipated expert were based on issues of credibility and weight to be considered and afforded at trial.

[8] The transcripts of the two-day trial were not finally prepared and docketed until mid-October 2011. Plaintiff made no issue of his inability to consult the written transcript before preparing and filing his post-trial brief. Rather than use the written transcripts, therefore, counsel for Plaintiff obtained a CD of the oral trial proceedings and he refers to the times of day on the CD as the citations for his discussion of the facts in his brief.

8, 2011, but expressly during oral argument on January 23, 2012, counsel for Trustee conceded that he had not established the predicate value of the Home required to prove his allegations in Count III against Defendants.  On February 28, 2012, after further review of the record, I entered judgment in favor of Defendant PGE and against Plaintiff Trustee on Count III, the only count addressed against PGE.[9]

As I reviewed the parties' memoranda and the record in this case, I questioned whether the conveyance by the family trust to Debtor of the title to his Home might constitute value in this dispute.  I therefore scheduled, by my Order dated March 1, 2012, further oral argument on this specific issue to be held on March 12, 2012.  I expressly permitted counsel to argue telephonically and asked them specifically to address whether title to the Home might constitute value.[10] Oral argument was held and concluded on March 12, 2012.  This matter is now ripe for my determination.

---

[9] See note 2 and accompanying text, supra.

[10] As noted above, on February 28, 2012, I had entered judgment in favor of PGE, thereby eliminating PGE from the case as a party. Nevertheless, PGE's counsel requested leave to participate in the March 12, 2012 oral argument and I granted his request.

# B.  FACTUAL BACKGROUND

The material facts in this matter (other than the value of the technology to create the new product line) are not significantly disputed.  The facts set forth in the parties' Joint Pretrial Statement, whether identified as disputed or as undisputed, ignore much of PGE's early difficulties in developing the technology at issue as unimportant for my final decision.  The parties' discussions of the facts in the Joint Pretrial Statement begin after Debtor, individually at first and later through SAS, split from PGE.  A fuller rendition of the factual background relating to the technology, and the history of the various loans, financial issues, and title to the Home, however, provide helpful context for resolving this litigation.

## 1.  Development and History of the Stacker System

Debtor's father was the principal owner of PGE.  Sometime in 2005, PGE attempted to develop and sell an automated system for use in the high-speed printing industry.  PGE created the Commander 140 Vertical Stacker (the "Stacker") largely through the leading efforts of Debtor as its agent and employee.[11]  The Stacker proved useful in the printing industry by providing a

---

[11] Joint Statement ¶ 17.  This is the only fact, uncontested or contested, in the Joint Statement that pertains to the historic development of the Stacker technology.  All other disputed and undisputed facts in the Joint Statement relate to events between and among the parties after Debtor decided to break away from PGE and, eventually, form SAS.  Debtor's breakaway and the creation of SAS occurred after PGE developed the Stacker technology.

robotic system for printing companies to stack the various bundles of printed

materials after they were printed and wrapped.    Development and production of

the initial and later Stacker units was financially disastrous, costing PGE far in

excess of its available capital.[12]

The Stacker drew a great deal of interest in the trade, however, and

PGE sold its first three units for slightly over $1,000,000.[13]  Some confusion exists

in the record about this number, who sold the units, and how many units were sold.

Defendant PGE notes at page 4, Part I. D., in its post trial memo, that PGE received

the first three orders and received slightly over $1,000,000 (net after sales

commissions) for them.  Each Stacker sold for about $336,000 each.  PGE went on

to note that it received additional orders for seven Stackers for a total net price (net

after sales commission) for the seven units of $1,932,285.  The later Stackers sold

(net after sales commission) for about $276,000 each.  Debtor testified that it cost

him $4,000,000 to produce Stackers that sold for $3,000,000.[14]  Although PGE or

---

[12] PGE established an additional line of credit with VIST Bank to fund the development of the Stacker.  In April 2007, the amount that PGE owed VIST was $147,037.70.  Joint Statement, ¶ 4.

[13] Joint Statement, ¶ 19.  PGE spent hundreds of thousands of dollars more than the $1,000,000 price to produce these Stackers.

[14] Debtor's Schedule F confirms this.  He lists over $800,000 of unsecured creditors, almost all of which debt can be attributed to the failing financial efforts of SAS.  I take judicial notice, under Fed. R. Evid. 201 (incorporated into bankruptcy cases by Fed. R. Bankr. P. 9017), of the docket entries and the bankruptcy petition, schedules, and statement of financial affairs filed in this case.  See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n. 3 (3d Cir. 1991); Levine v. Egidi, No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. March 8, 1993); In re Paolini, No. 85-00759F, 1991 WL

Debtor or both lost more than $210,000 on each sale of the first three Stackers,

SAS and Debtor sold each subsequent Stacker for about $60,000 less. This was not

a good way to stay in business.[15]

      First PGE, and later Debtor, and then SAS, could not produce Stackers

that delivered even a gross profit (gross sales price less sales commission less cost

of goods sold). The cost of raw materials exceeded each Stacker's net selling price.

Without accounting for labor (compensation, taxes, benefits, etc.), administration,

utilities, legal, accounting, insurance, other overhead, and all other soft and hard

sales and production costs, each Stacker cost more to build and sell than either PGE

or Debtor or SAS received for it. Accounting for labor, administration, utilities,

legal, accounting, insurance, other overhead, and all other soft and hard sales and

production costs, the Stackers cost hundreds of thousands of dollars more to

produce than either PGE, Debtor, or SAS received. Production and sale of the

---

284107, at *12 n. 19 (Bankr. E.D. Pa. Jan. 11, 1991); see generally Nantucket Investors II v. California
Federal Bank (In re Indian Palms Assoc., Ltd.), 61 F.3d 197 (3d Cir. 1995).
    Although I may not take judicial notice sua sponte of the facts contained in the debtors' files that
are in dispute, In re Augenbaugh, 125 F.2d 887 (3d Cir. 1942), I may take judicial notice of adjudicative
facts "not subject to reasonable dispute . . . [and] so long as it is not unfair to a party to do so and does
not undermine the trial court's fact finding authority." Indian Palms, 61 F.3d at 205 (3d Cir. 1995)
(citing Fed. R. Evid. 201(f) advisory committee note (1972 proposed rules)).

    [15] I understand full well that certain extraordinary, initial development costs would not have been
repeated and the cost to produce each of the seven subsequent Stacker units might be less than the cost to
produce each of the first three, but neither Defendant presented any evidence about the non-recurring,
start-up costs, if any, that would be eliminated from the cost of subsequently produced Stackers by
Debtor or SAS. Neither did either Defendant present any evidence about learned efficiencies in
production that Debtor or SAS might have enjoyed through experience in manufacturing the Stackers.

Stackers immediately and manifestly proved a losing proposition.

PGE and later Debtor and then SAS received orders for Stackers, but neither PGE nor Debtor nor SAS could sell the Stackers for anything remotely sufficient to break even. Making a profit was a dream (or perhaps a nightmare).[16] Initial production costs and losses on the sales of the Stackers forced PGE both to exhaust its available capital and to open a new line of credit with VIST. PGE decided in 2006 that it did not want to deal with the river of red ink associated with manufacturing the money-losing Stackers. PGE decided to staunch the hemorrhaging and terminate its production of the Stacker. Debtor, as an employee of PGE, had been the driving force behind the Stacker and its technology, and he wanted to continue its production. To do so, Debtor decided to produce the Stacker himself in Spring/Summer 2006 as a sole proprietorship and then through SAS in August 2006.[17] At about the same time as his spin off from PGE, Debtor agreed that he would "repay" to PGE $400,000 as an amount that PGE had spent to develop the Stacker. No documents memorialize any of the terms of Debtor's

---

[16] I must comment briefly on Debtor's laudable entrepreneurial mind-set. He exemplifies the spirit of small business owners throughout the United States who want to go it alone and build a better mousetrap. His desire to do so is utterly commendable. Unfortunately this venture did not work for him. History is rife with household names whose first efforts failed, but who ultimately hit it big: Hershey, Edison, Disney, P.T. Barnum. A hearty and sincere *bonne chance* goes to Debtor if he takes another shot at his dreams.

[17] Joint Statement, ¶¶ 13 & 18.

voluntary, unsecured repayment agreement.

Furthermore, none of the parties have suggested that Debtor's spin off was a purchase and sale of anything. No evidence whatsoever was presented that showed that Debtor purchased the Stacker technology in exchange for his voluntary agreement to "repay" $400,000 to PGE. To the contrary, PGE wanted no parts of the Stacker or its technology and dumped it. Debtor simply picked it up. In Debtor's mind (expressed through his testimony), he felt a separate, moral obligation to try to pay PGE for at least some of its losses incurred from producing the Stackers.

Immediately upon starting in business, Debtor utilized the technology for manufacturing Stackers. He did this with no formal permission or license from PGE or any family member. In Spring/Summer 2006, no one stated orally or in writing what terms, if any, governed Debtor's use of the Stacker technology. PGE and the family members simply regarded the technology as something that PGE had given to Debtor to use without restriction, qualification, or limitation. In August 2006, Debtor assigned the Stacker technology to SAS, with no warnings or repercussions from PGE or his family. Until November 2008, none of the parties did anything to restrict, qualify, or limit the use of the technology in the hands of Debtor or SAS. On November 24, 2008, PGE and SAS executed a Technology

License Agreement (the "Technology License"), licensing the Stacker technology

to SAS, effective retroactively, as of July 1, 2007.[18]

Debtor and SAS never had a chance. No testimony or exhibits

provided any forecast, projection, or explanation to remotely suggest that

manufacturing Stackers at any time after the technology was given to Debtor,

would or could produce anything but continuing losses. Saddled with paying

monthly debt payments to PGE and selling each Stacker for less than the cost of its

raw materials, Debtor and SAS were doomed to fail.

## 2. Debtor's Secured Guaranty of PGE's Debt to M&T

This case is about Trustee's attempt to avoid the mortgages securing

two loans, in the aggregate face amount of $650,000, which loans PGE borrowed

from M&T. The M&T loans were created, revised, and documented in fits and

starts, which led to some confusion and ultimately to this litigation. Defendant

M&T asks that I look at the history of its attempted loans to PGE, Debtor, and SAS

and then consider what was intended globally as explaining and rationalizing the

---

[18] Joint Statement, ¶ 16. The choice of this effective date appears to have been arbitrary and is certainly unhelpful in resolving any aspect of this dispute. The rationale for this date was not explained through any testimony or exhibit. July 1, 2007 is not the date the technology was initially given to Debtor – Spring/Summer 2006; it is not the date on which Debtor formed SAS and transferred the technology to it – August 2006; and it is not within the period in which the M&T loans, guaranties, and mortgages originated – April/June 2007.

I discuss the Technology License at more length below.

end result. I reject M&T's request because I will determine the rights of all parties based solely on that which actually happened and what documents were actually executed by the parties.

On March 7, 2007, M&T issued a commitment letter to SAS, which letter contemplated that a single loan in the amount of $400,000 would be made to SAS, secured by, among other collateral, mortgages on the Home and other property owned by the family trust. Everyone believed that Debtor held the title in the Home. M&T required that the loans be guarantied by PGE, Debtor, and Debtor's father. The stated purpose of the loan was to pay off the balance of the existing line of credit owed to VIST by PGE. At some time after March 7, 2007, the parties realized that Debtor did not own the Home. M&T changed the loans[19] so that the proceeds would go to PGE directly with a guaranty and mortgage from whomever owned the Home. That is the loan structure that ultimately closed.

On April 27, 2007, Debtor's father, as president of PGE, signed a note in the amount of $250,000 for money loaned to PGE by M&T.[20] The loan proceeds of $250,000 were used by PGE to pay off the line of credit debt to VIST in the

---

[19] M&T issued no new commitment letter.

[20] Joint Statement, ¶ 2. The parties offered no evidence to explain how or why the first loan, with the new amount of $250,000, came into existence.

amount of $147,037.70.[21]  The balance of the $250,000 loan was paid directly to

PGE,[22] presumably to pay debts related to producing the Stacker and to replenish

its working capital.[23]  The Second M&T Mortgage, given by Debtor to M&T on

April 27, 2007, was said to secure payment of Debtor's unlimited guaranty, which

was purportedly dated April 27, 2007.[24]  As of April 27, 2007, however, no such

unlimited guaranty obligated Debtor to repay any amount.  Paragraph 1.1 of the

Second M&T Mortgage, notes that it secures Debtor's unlimited guaranty dated

April 27, 2007, which does not exist.[25]  Paragraph 1.1 goes on to provide, however,

that the Second M&T Mortgage also secures a "certain Term Note dated April __

[sic], 2007," by PGE for $250,000.[26]  Debtor's grant of the Second M&T Mortgage

on his Home was therefore an accommodation mortgage, securing the debt but

imposing no in personam liability on Debtor until the unlimited guaranty was

actually executed.

---

[21] Joint Statement, ¶ 4.

[22] Joint Statement, ¶ 5.

[23] I use "presumably" because the Joint Statement does not include this language.  The testimony
at trial implied that Debtor had assumed responsibility for repaying at least some of the PGE outlays of
capital in excess of the VIST line as working capital.  Any such testimony, however, was very limited
and terribly imprecise.

[24] Exhibit T-9.

[25] Id.

[26] Id.

On June 8, 2007, Debtor's father, as president of PGE, signed a second note, in the amount of $400,000, for money loaned to PGE by M&T.[27] The Third M&T Mortgage, given by Debtor to M&T on June 19, 2007, was said to secure payment of the June 8, 2007, loan in the amount of $400,000.   Paragraph 1.1 of the Third M&T Mortgage notes that it secures Debtor's unlimited guaranty dated June 8, 2007,[28] but no such guaranty exists.[29] Paragraph 1.1 goes on to provide, however, that the Third M&T Mortgage also secures a term note dated June 8, 2007, by PGE for $400,000.[30] No evidence explained the use or purpose of the proceeds from the $400,000 loan.

Presumably, the proceeds of the two loans in excess of the amount paid to eliminate the VIST line of credit were intended for PGE to pay its debts related to producing the Stacker and to replenish its working capital.[31] On June 19, 2007, Debtor executed an unlimited guaranty in favor of M&T guarantying

---

[27] Joint Statement, ¶ 7.

[28] Exhibit T-11.

[29] Debtor's unlimited guaranty of PGE's debt to M&T is dated June 19, 2007.  Joint Statement, ¶8, Exhibit T-12.

[30] Exhibit T-11.

[31] Once again, I use "presumably" because the Joint Statement does not include this language and no evidence showed whether PGE used the funds to replenish capital, to pay creditors other than VIST, or for some other purpose.

payment of both the $250,000 and the $400,000 loans.[32]   No party presented

evidence of any loan documents that identified the Stacker technology as collateral

for M&T's loans.  Nevertheless, the witnesses at trial testified as much.  The

security agreement dated April 27, 2007,[33] and signed by PGE as part of the loan

transactions, identifies only general categories of collateral, including general

intangibles.  General intangibles, of course, include intellectual property[34] such as

the Stacker technology.  The Stacker technology could only be collateral for

M&T's loans if PGE owned it, because no security agreement or other document in

evidence purported to pledge SAS's general intangibles to secure the M&T loans.

If the Stacker technology had been given to Debtor (and then assigned to SAS) in

2006, it could not have been pledged to M&T as its collateral.

Debtor's testimony was unambiguous that he believed it was his moral

responsibility to "repay" $400,000 to PGE to reimburse it for development costs of

the Stacker technology.  Neither Debtor nor any other witness testified about any

agreement (whether oral or written) through which PGE gave Debtor the Stacker

technology in exchange for taking on the $400,000 debt.  Debtor felt it was his

---

[32] Joint Statement, ¶ 8.  Exhibit T-12.

[33] Exhibit T-10.

[34] See, e.g., U.S. Claims, Inc., v. Flomenhaft & Cannata, LLC, 519 F. Supp. 2d 515, 528 n. 5
(E.D. Pa. 2006).

-17-

moral obligation to repay the $400,000.  Debtor said nothing, furthermore, about

any obligation, intention, or moral compunction to repay an additional amount of

$250,000 to PGE.[35] After the VIST line of credit was paid in full ($147,037.70), a

bit more than $500,000 of additional proceeds went to PGE with no explanation of

their use or purpose.  Debtor's voluntary assumption of debt owed to PGE

($400,000) was not extinguished by the payment of the proceeds of the M&T

loans.  Debtor continued to owe and pay PGE monthly payments in the amount of

the debt service for the $400,000 loan.

Starting in at least 2000, a Scheffler family trust held title to the

Home.  Debtor was permitted to live in the Home, provided he pay all bills for its

utilities, maintenance, etc.  Debtor made all such payments and put a substantial

additional amount of effort and time (and his parents' money) into significantly

expanding and improving the Home.  Debtor's uncontradicted agreement with his

family was that the trust would convey title to the Home to him if he continued to

---

[35] In argument on March 12, 2012, PGE's counsel tried to locate testimony of Debtor's father that Debtor had also taken on the additional $250,000 debt before he executed the $650,000 guaranty. This argument failed.  First, I recall no such testimony.  Second, counsel failed to find any reference in the record to support his statement.  Third, it matters not that Debtor's father thought that Debtor had assumed the debt of PGE in the amount of $650,000; it matters only whether Debtor acknowledged his assumption of debt in the amount of $400,000.

Pennsylvania's Statute of Frauds does not disallow a debt obligation that the debtor acknowledges (the $400,000), but it blocks a claim of an oral assumption of the debt of another if it is not expressly acknowledged by the purported debtor (the additional $250,000). 33 P.S.§3.  Debtor's written (and executed) guaranty of PGE's debt owed to M&T is valid, of course, but it represents a significant, previously unacknowledged increase of his prior "moral" obligation.

pay all expenses and if he repaid to his parents the debt relating to his improvement

of the Home.   Debtor repaid his family for the cost of the improvements by

reimbursing them for each payment they made to Bank of America, which held the

BoA First Mortgage on the Home.   At the time Debtor filed his bankruptcy

petition, the debt to Bank of America secured by the BoA First Mortgage was

$148,556.16.

On April 25, 2007, however, before Debtor had any opportunity to pay

the BoA First Mortgage in full, the family trust conveyed title for the Home to

him.[36]  Two days later, on April 27, 2007, Debtor executed the Second M&T

Mortgage on his Home, securing his later guaranty of the $250,000 loan by M&T

to PGE.[37]  The amount outstanding on the Second M&T Mortgage as of the petition

date was $252,273.29.[38]  On June 19, 2007, Debtor executed the Third M&T

Mortgage on the Home, securing his guaranty of the $400,000 loan by M&T to

PGE.[39]  The amount outstanding on the M&T Third Mortgage as of the petition

---

[36] At the time the Home was conveyed to Debtor, he and the trustees (his parents) understood and agreed that the Home would be collateral for the loans by M&T to PGE.  Joint Statement, ¶ 22.  The stipulated language is careful not to claim that in exchange for title to the Home, Debtor granted the two mortgages.  As of the filing date of Debtor's petition in bankruptcy, the value of the Home was $350,000.  Joint Statement, ¶ 11.

[37] Joint Statement, ¶ 3.

[38] Joint Statement, ¶ 6.  Again, Debtor has neither testified nor acknowledged that he regarded the $250,000 loan as his moral obligation.

[39] Joint Statement, ¶ 9.

date was $365,068.82.[40]

  None of the proceeds from either the $250,000 loan or the $400,000 loan were paid to Debtor or SAS; none of the proceeds from either the $250,000 loan or the $400,000 loan benefitted, directly or indirectly, Debtor or SAS. In April and June 2007, Debtor encumbered his Home with the Second M&T Mortgage and the Third M&T Mortgage. From June 2007 through late 2008, Debtor (or SAS) paid regular monthly payments for the M&T $400,000 loan to PGE, and PGE would then pay the monthly loan payments to M&T.[41] Defendants claim that PGE gave Debtor and SAS the Stacker technology and certain customer contracts for the purchase of Stackers in exchange (as value) for the two M&T mortgages and Debtor's/SAS's promise to make monthly loan payments to PGE.[42] No evidence, however, supports the existence of any such agreement. To the contrary, the evidence shows that the Stacker technology had been given to Debtor more than a year before the two mortgages on the Home were given to M&T.

  On November 24, 2008, one and a half years after the loans were

---

[40] Joint Statement, ¶ 10.

[41] In Paragraph 3.c. of Debtor's Statement of Financial Affairs, Debtor denied have made any payments to an insider (his family, including PGE) within the year before his August 2009 petition date. See n. 14, supra, for support of my consideration of Debtor's Statement.

[42] As I will discuss in more depth below, the Stacker technology had been given to Debtor a full year before the M&T loans and mortgages came into existence. Simply put, the Stacker technology was not given to Debtor or SAS in exchange for the M&T loans and mortgages.

advanced and the mortgages were recorded, PGE and SAS first entered into the

Technology License. The Technology License was effective "as of July 1, 2007."

Defendants ignore its language and claim that it formalized the technology transfer.

By November 2008, Debtor and SAS were in dire financial straits and were a hair's

breadth from collapsing.[43]  The Technology License was not effective as of

Spring/Summer 2006 when Debtor and later SAS were given absolute, unrestricted

use of the Stacker technology; the Technology License was not effective as of

April/June 2007 when the M&T mortgages were recorded against Debtor's Home.

The long-after-the-fact Technology License is onerously one-sided.   It was and is:

non-exclusive; terminable without cause; and for technology that may have been

pledged to M&T as collateral for the loans to PGE.

Debtor and SAS had a number of orders for Stackers and worked very

hard to produce them for their customers.  But they lost a great deal of money on

every Stacker they sold.   Debtor lived out of his car trying to install a Stacker at

the facilities of a customer because SAS could not afford for him to stay in a cheap

motel.   SAS sold the Stackers for far less than the cost of their raw materials. SAS

and Debtor had no funds to cover labor, administration, utilities, legal, accounting,

---

[43] Mere days after the Technology License was executed, the last Stacker customer of SAS demanded the return of its deposit, which forced SAS to shut down its operations.  A month later, on January 22, 2009, SAS closed its doors.

insurance, other overhead, and all other soft and hard sales and production costs,

such as a cheap motel room. For every Stacker that Debtor and SAS manufactured

and sold, they lost ever more money, spiraling into inevitable financial oblivion.

These factors strongly influence, but do not control, my finding that

the Technology License had no value. For my decision of the value of the Stacker

technology, I accept and rely on Trustee's expert witness.

## 3. Value of the Stacker System Technology[44]

In the battle of the experts, I was faced with two very different

approaches to evaluate the technology and the Technology Licence that enabled

Debtor and SAS to manufacture the Stackers. I could not avoid believing that

Defendants' expert would have grasped any approach he could find to establish

some value in the Stacker technology. On the other hand, Trustee's expert, David

Weinberg, simply, rationally, and credibly presented the facts necessary to

determine the (absence of) value of the Stacker technology as an integral part of the

business of Debtor and SAS and presented his opinion accordingly. I find the

opinion about the lack of value of the Stacker technology presented by David

Weinberg to be clear, succinct, and credible, comporting with all that my prior

_____

[44] For an excellent article that provides the reader with a basic understanding of the methodologies used to value an asset, see Honorable Christopher S. Sontchi's recent article at "Valuation Methodologies: A Judge's View" Amer. Bankr. Inst. L. Rev., Vol. 20, No. 1, pp. 1 - 16 (Spring 2012).

legal and current judicial experience in business transactions tells me is correct. I

will set forth my analysis of both experts and their opinions.

### (a.)  David Weinberg - Stacker technology has no value

Penn Hudson Financial Group is a well known regional financial

advisory and counseling firm.  David Weinberg is the Managing Director for Penn

Hudson in its Crisis Management and Small Cap Transactions Group.  He earned

an M.B.A. from Cornell and an M.S. in Taxation from Temple.[45]  Over Mr.

Weinberg's 25+ year career, he has earned recognition as a Chartered Financial

Analyst, a Certified Insolvency and Restructuring Advisor, a Certified Turnaround

Professional, a Certified Fraud Examiner (pending), and is certified in Distressed

Business Valuation.  He has been previously admitted as an expert in valuation in

the Eastern District of Pennsylvania Bankruptcy Court (before judges other than

me).  In at least one bankruptcy case in Philadelphia, Mr. Weinberg testified as an

expert in the valuation of intangible assets in a troubled company.    Mr.

Weinberg's skills and talents are broad and varied in the field of bankruptcy,

insolvency, and valuation.  The Trustee offered Mr. Weinberg as an expert in the

---

[45] Of interest, if not of importance in this dispute, Mr. Weinberg also earned a Masters in
Journalism from Temple.

valuation of a business, including its intangible assets.

Counsel for PGE acknowledged Mr. Weinberg's expertise in the matter of valuing a company, but he objected to admitting him as an expert in evaluating intangible assets. He noted that none of Mr. Weinberg's listed skills included determining the value of intellectual property. I was entirely satisfied, however, with Mr. Weinberg's response that an integral part of the valuation of any company must be a determination of how its assets, including intangibles, are or are not sources of cash flow (whether positive or negative). His evaluations have included his analyses of various intangible assets, including method patents. His view of licensed rights such as the Technology License focuses on the cash flow that the holder of such rights enjoys (or suffers) from them. The value of an asset (tangible or intangible) in a company is ultimately determined by whether such asset generates cash that provides an appropriate rate of return. Mr. Weinberg has opined in the past about the value of intellectual property, such as technology rights, as something that either a bankruptcy estate or a distressed business should sell or dump.

Mr. Weinberg acknowledged in cross-examination that he had never been admitted as an expert in court solely about the value of a technology license and had been engaged only once for his written opinion of the value of a general

-24-

intangible − a brand name.  He also explained that he had no specific training in

the legal side of technology assets, but that his training and experience were

concentrated in the economic aspects of such property.

PGE objected to Mr. Weinberg's qualifications as an expert on the

valuation of a licensing right.  M&T, although conducting no cross-examination on

this issue, joined in PGE's objection.  I overruled the objections largely on the

basis of Mr. Weinberg's last comment on cross-examination.  He stated, quite

frankly, that he may not be able to understand, even generally, what a Stacker does,

and he might not be able to apply for its legal patent, and he might not be able to

understand its technological workings.  He went on to testify that, although he

might not know much about the legal or technical aspects of a specific technology,

he knows about the economic value of any asset, including intangibles, significant

to a business.  For quite some time over the past few years, a buyer (or a court)

would be unable to evaluate a company without considering its intellectual

property as integral to the evaluation of the company.

I admitted Mr. Weinberg as an expert in the valuation of SAS,

including the economic value of its various components, specifically the Stacker

technology.

Mr. Weinberg examined SAS's tax returns and other financial

information, both internally and accountant prepared. This included the opinion

letters prepared by the accountants and summaries of the financial performance of

SAS. He reviewed general information about the printing equipment industry and

the Technology License. Mr. Weinberg concluded that SAS had no value at any

time he could evaluate it from 2006 through SAS's close of business in 2008.

SAS's financial difficulties were created by selling the Stacker for prices less than

the cost of its raw materials. No matter how many Stackers SAS sold, it had

historically enjoyed, and would in the future enjoy, no profit. Payroll, travel,

administration, insurance, utilities, and other hard and soft operating costs and

expenses could not be paid from the revenue generated by sales. By Spring 2007,

SAS already had substantial negative net worth. Its value at that time and at its

inception in August 2006 was Zero.

Mr. Weinberg described the Technology License as restrictive,

punitive, and deprivative: Restrictive because it could not be transferred, assigned,

or sublicensed; punitive because PGE could cancel the license without cause on 30-

days notice, take and finish all work in process, and retain all compensation arising

from that work; and deprivative because the license was non-exclusive and PGE

could assign the technology to any other business or businesses. Beyond these

three negatives, the technology also was said to be subject to the security interest in

general intangibles pledged by PGE to M&T to secure PGE's debt owed to M&T.

The only value (such as it was) that Debtor enjoyed from the Technology License was fulfillment of his aspiration to use the technology to run his own business. Debtor, individually and through SAS, tried to use the Stacker technology to manufacture a product that would sell for more than it cost to produce. Had he done so, he would have had no protection against PGE, unilaterally and for no cause, terminating the Technology License and enjoying the fruits of his labors. Defendants argue in their briefs that this was a family business with no statement of any intention to do such a nasty thing. But the testimony was clear and Defendants admitted in their briefs that family friction led to the break up of the family business and the ouster of Debtor and his Stacker technology from PGE.

Furthermore, any value that might be attributed to the Technology License was only as of July 1, 2007, the effective date of the Technology License. The two mortgages were imposed in April and June 2007. The time for any valuation, therefore, expired before the Technology License came into existence, even retroactively.

As a result of all of the detriments to determining that the Technology License had any value, Mr. Weinberg concluded his direct testimony with his

conclusion that the economic/monetary value of SAS for April - June 2007 was Zero. Interestingly, although it can certainly be inferred from his testimony, Mr. Weinberg did not expressly say in his direct testimony that the value of the Technology License was Zero. This omission, if omission it was, was remedied on Defendants' cross-examination of Mr. Weinberg.

Cross examination by counsel for both PGE and M&T did not discredit or shake anything Mr. Weinberg said in his direct examination. To the contrary, Defendants' cross examination of Mr. Weinberg added substantial meat to the bones of his direct testimony. In response to a question from PGE's counsel, Mr. Weinberg testified that he was referring to the value of SAS that would be embedded in its equity by virtue of having access to the Technology License. But, he added, the value of the Stacker technology to SAS was Zero. Reviewing the Technology License alone, with its restrictive, punitive, and deprivative nature, he accorded no value on the open market for the Technology License.

Merely because Debtor never actually attempted to transfer, assign, or sub-license the technology to a third party other than SAS does not mean that Debtor or SAS would not have later decided to do so.[46] The Technology License

---

[46] I am aware also that, when Debtor first started his sole proprietorship in Spring/Summer 2006 he used, with no limitation whatsoever, the Stacker technology. When he formed SAS in August 2006, he openly transferred the technology to SAS without repercussions from PGE. This wrinkle in the analysis of the Stacker technology is discussed more fully below.

was restrictive because it barred SAS from making any such business decision.

Merely because PGE never exercised its right to terminate[47] did not mean that the

friction among the family members might not lead to a contrary intention and

adverse decision of the family members.  The Technology License was punitive

because PGE could, if it so desired, terminate the use of the Stacker technology for

no reason.  Merely because PGE did not evince a desire to license the technology to

any other company did not mean that, if the technology had proven worthwhile, it

would not have done so.  The Technology License was deprivative because it was

non-exclusive and PGE could license the Stacker technology to any other entity (or

keep it for itself) at any time.

I stress a couple points.  First, Mr. Weinberg's opinion of value was as

of April - June 2007.  Mr. Weinberg did not make a retroactive evaluation based on

the financial failures of SAS in the end of 2007 through 2008.  Although SAS

collapsed less than one and a half years later, Mr. Weinberg noted his reliance

solely on financial information of Debtor and SAS in 2006 and 2007 to determine

the technology's  value was Zero.  From its inception in PGE, through Debtor's

---

[47] Where is the Stacker technology now?  No testimony was given explaining anything about the
technology and the Technology License after Debtor filed his bankruptcy, although it appears that it is no
longer in the estate either directly or indirectly (through SAS).  If SAS does not have it, PGE appears to
have terminated the Technology License and to have re-taken the Stacker technology some time within
the year before Debtor filed his bankruptcy petition.

sole proprietorship, through the first nine months or so of SAS, every Stacker that

PGE, Debtor, or SAS sold lost money for them. As of April - June 2007, based on

(1) the financial performance of PGE, Debtor, and SAS leading up to that time

frame and (2) the terms of the onerous Technology License, Mr Weinberg found

that the Stacker technology had Zero economic value. I agree.

The opined worthlessness of the Stacker technology was confirmed,

not established, by the continual losses incurred by Debtor and SAS. As noted in

testimony, SAS continued through 2008 to sell Stackers for less than the cost of

raw materials. This is further evidenced by Debtor's list of over $800,000 of

unsecured debt in his Schedule F,[48] almost all of which are attributed to the failure

and inability of SAS to pay its obligations.

## (b.)  Damon Neagle - Stacker technology has substantial value

Defendants' expert was Damon Neagle, a local attorney concentrating

his practice in intellectual property. He has been involved in the valuation and sale

of numerous intellectual property assets.

Mr. Neagle, unlike Mr. Weinberg, made serious leaps of faith and

failed analyses to arrive at his two very different valuations ($440,000 and

$793,000) of the Stacker technology. Under his "cost" approach valuation, Mr.

---

[48] See note 14, supra, for support for my consideration of Debtor's schedules.

Neagle said simply that because it cost PGE at least $440,000 to develop the

technology, its value was $440,000.  The absurdity of this statement is stunning.

The cost approach to evaluating buildings is standardized because volume after

volume of construction manuals contain average prices for constructing different

types and sizes of buildings with various materials.  Using the average, standard

prices for bricks and mortar, a real estate evaluation professional can accurately

estimate how much it might cost to build the structure and thereby establish one

measure of its value.  On the other hand, using the cost of development of a single,

unique asset such as the Stacker technology as its value falls flat in all respects.

Mr. Neagle assumes that it cost PGE at least $440,000 more than its

sale price to develop the Stacker technology from the ground up.  PGE claims that

it cost quite a bit more than $400,000 over its selling price for the first three

Stackers.  Hypothetically, if PGE had not run into as much trouble with its initial

production of the prototype Stacker through a third party and if it had cost PGE

only $200,000 more than its sales price to produce, would that mean the value of

the identical technology was $200,000?  If the cost to produce had been $10,000,

what would the technology be worth?  What if Debtor, as an employee of PGE had

been able to develop the technology at no cost over the price paid for the

prototypes?  Would the Stacker technology be worthless?  It may very well be

worthless, but its worthlessness has nothing to do with what it cost to develop it. Using the cost method to develop a unique technology, whether by PGE, Apple, or IBM, is a strikingly inappropriate methodology to determine the market value[49] of technology generally, and of the Stacker technology in particular.

Mr. Neagle also evaluated the Stacker technology using a capitalization of hypothetical income approach to derive a value of $793,000. To develop the income approach value, Mr. Neagle assumed a profit of 8% arising from the sale of Stacker units produced using the technology at issue. He also assumed a ten-year useful life of the technology. Both the profit margin and the useful life are figures obtained from thin air. Mr. Neagle used the 2010 (not 2007) Quarterly Financial Report of The U.S. Census Bureau containing the average pre-tax profit margins for manufacturers of <u>electrical equipment, appliances, and components</u>. Mr. Neagle looked at the economics of a wholly unrelated industry and ignored the actual, terrible absence of profit from selling every one of the Stackers at a huge loss. He believes the technology had value simply because it worked and because SAS had buyers for the Stackers. Disregarding that each Stacker sold for less than even the raw material costs of manufacturing it, Mr. Neagle found that his income approach led to the incredible value of $793,000 for the technology.

---

[49] A company might establish the accounting-driven <u>book value</u> of technology through its cost to develop it. That is worlds different from determining its <u>market value</u>.

No witness testified that, with perhaps some tweaks or twists, the Stackers could be produced at a cost that would generate a profit. No witness testified that, after the first dozen units had been manufactured and sold, the cost to produce each Stacker thereafter would be reduced sufficiently to generate a profit. No witness testified that, with another $1,000,000 of capital invested in SAS, the Stacker technology could become more efficient and sales of the Stacker would thereby generate a profit. No witness testified that the Stackers could now (or soon or ever) be sold at a higher price, well in excess of raw materials and all other costs. No witness testified to anything that might possibly lead me to believe that production of the Stackers based upon the technology would, could, or might somehow generate even a gross profit, let alone a net profit for Debtor or SAS. The only testimony about future sales was that the more Stackers that SAS made and sold, the more money it lost and would lose.

As I mentioned above, I find Mr. Neagle's evaluation of the Technology License to be incredible. I reject both his cost approach valuation of $440,000 and his income approach valuation of $793,000.

### c. The Technology License

Upon my closer analysis of the Technology License, I find a different twist based on both the license itself and the testimony of the parties. The

-33-

Technology License was not a formalization of the previously silent permission of

PGE to allow Debtor and SAS to develop the Stacker. In November 2008, the

writing was on the wall regarding the inevitable fate of SAS. Its fruitless efforts to

make a bare living for Debtor by producing the Stackers was utterly failing.

Debtor's family realized that the Stacker technology, however valueless it might be,

would be lost upon the collapse of SAS. PGE conferred with patent counsel, who

developed the incredibly one-sided Technology License on behalf of PGE. Debtor

testified that he did not negotiate any of the terms of the license. Furthermore, no

one testified about any terms imposed on Debtor when he was first permitted to use

the technology to manufacture Stackers in Spring/Summer 2006.[50] I believe from

the circumstances and therefore find as a fact that the sole reason the Technology

License was prepared was not to formalize the licensing of the technology to Debtor

and SAS by PGE, but was to completely redo and revise the unwritten, unqualified,

unlimited transfer of the Stacker technology to Debtor in Spring/Summer 2006.

PGE wanted a way to take the technology back.

Debtor accurately claimed in his Schedule B that the value of defunct

SAS was Zero. If the Stacker technology is truly worth between $440,000 or

$793,000, SAS would have had substantial value by holding that technology.

---

[50] No testimony provided even a suggestion that the initial transfer of the Stacker technology to Debtor was qualified, restricted, or conditioned by anything.

Where then is the Stacker technology?  If SAS does not have this asset, who does?

Did PGE "take" the technology some time during 2009, after Debtor and SAS gave

up their fight and closed, but before (or after) Debtor filed his underlying Chapter 7

case?  Shortly before (or after) Debtor's bankruptcy filing, did PGE take from the

control of the estate an SAS asset worth $440,000 to $793,000?  The record does

not reflect any investigation or action by the Trustee along these lines.  But the lack

of any such investigation would be appropriate in light of the Trustee's belief that

the Stacker technology is worthless.  If this litigation were to establish that the

technology has great value and that PGE took it back after Debtor's filing or within

a year before Debtor filed, further consideration by the Trustee might be

appropriate.[51]

In Spring/Summer 2006, Debtor produced (or at least started to

produce) Stackers as a sole proprietorship.  In August 2006, he formed SAS, gave

unfettered use of the Stacker technology to SAS, and allowed SAS to manufacture

the Stackers.  No evidence suggested that Debtor needed or sought PGE's

permission to transfer the technology to SAS.  The Technology License would have

---

[51] Paragraph 5 of Debtor's Statement of Financial Affairs identifies a single item (a vehicle) as
having been repossessed, foreclosed upon, or returned to a creditor.  Paragraph 10 claims that no property
was transferred other than in the ordinary course of business.  Because the Stacker technology was in
SAS, Debtor would not have been obliged to disclose PGE's taking of the Stacker technology (if it did
take it).

-35-

prohibited such transfers of the technology if it had been in effect in 2006, but Debtor had clearly transferred the technology. This shows that the November 2008 creation of the Technology License was not a formalization of PGE's prior permission to Debtor and then SAS to use the technology, but was a new set of restrictive, punitive, and deprivative terms limiting the technology.

# IV. DISCUSSION

# A.  JURISDICTION AND POWER

In the first section of their Joint Pre-Trial Statement, all three parties agreed as follows: "Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1334, and this is a core proceeding under 28 U.S.C. §157(b)(2)(A), (H), and (O)."[52] Their agreement about the nature of this proceeding confirms and consents to my power to hear and finally decide this fraudulent transfer litigation pursuant to Section 157(2)(b)(H).  The parties further agreed that I have jurisdiction and the power to hear and finally decide this dispute because it relates to administration of the estate (Section 157(2)(b)(A)) and to liquidation of the assets of the estate (Section 157(2)(b)(O)).  The parties have acknowledged that I have the power and their consent to enter a final decision and judgment in this adversary proceeding. To the extent, however, that it is somehow determined that I lack either the jurisdiction or the power to issue a final judgment, despite the parties' consent,[53] I submit the findings of fact and conclusions of law set forth below.

---

[52] Joint Statement, Part I.

[53] See Stern v. Marshall, ___ U.S. ___, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).  See also Berks Behavioral Health, LLC, v. St. Joseph Regional Health Network (In re Berks Behavioral Health, LLC), 464 B.R. 684 (Bankr. E.D. Pa. 2012)(relating to the power and jurisdiction of bankruptcy courts following Stern v. Marshall).

# B.  STATUTORY PREDICATES

PGE's brief is accurate, including its presentation of the applicable law, until PGE addresses the value of the Technology License.  In Counts I and II of the complaint, Trustee seeks to avoid the Second M&T Mortgage and the Third M&T Mortgage as constructive fraudulent transfers.  Trustee bases his action on the Bankruptcy Code's adoption, among the powers of a Chapter 7 trustee, of the Pennsylvania law of fraudulent transfers:  Sections 544 of the Bankruptcy Code, 11 U.S.C. §544; and Sections 5101 et seq. of the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S.A. §5101 et seq. ("PUFTA").

Section 544 of the Bankruptcy Code provides that the Trustee shall have any powers that creditors of the estate could hold at the start of the case to avoid transfers of property.  Section 5104(a) of PUFTA provides:

> **§5104.  Transfers fraudulent as to present and future creditors**
> **(a) General rule.** – A transfer made or obligation incurred by a debtor is fraudulent to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (ii) intended to incur, or believed or reasonably should
> have believed that the debtor would incur, debts beyond
> the debtor's ability to pay as they became due.

12 Pa. C.S.A. §5104(a).[54]

PUFTA Section 5104(a)(1) does not pertain to this action because

Trustee does not assert that Defendants' actions constituted an actual fraud. Rather,

Trustee asserts that Defendants engaged in a constructive fraud pursuant to PUFTA

Section 5104(a)(2). The four elements of so-called constructive fraud are: (1)

Debtor had an interest in property; (2) Debtor transferred that interest within four

years before Debtor filed his bankruptcy petition; (3) Debtor was insolvent at the

time of the transfer or became insolvent as a result of the transfer; and (4) Debtor

received no reasonably equivalent value for the transfer. BFP v. Resolution Trust

Corp., 511 U.S. 531, 535, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994); Mellon Bank,

N.A. v. Official Comm. of Unsecured Creditors (In re R.M. L., Inc.), 92 F.3d 139,

144 (3d Cir. 1996).[55]

---

[54] In Kean v. Forman, 752 A.2d 906 (Pa. Super. 2000), appeal denied per curiam, 764 A.2d 1070 (Pa. 2000), cited by PGE, the court discussed the statute of limitations under PUFTA, but found PUFTA inapplicable.

[55] PUFTA Section 5109(2), 12 Pa. C.S.A. §5109(2); and Sections 544 and 546(a) of the Bankruptcy Code, 11 U.S.C. §§ 544 & 546(a). The statute of limitations for PUFTA is four years after the date of the transfer. Under the Bankruptcy Code, the two-part test for a state law fraudulent transfer claim is (1) the action must be maintainable under state law when the bankruptcy case is initially filed and (2) the action must be brought by the trustee within the earlier of two years after the date the trustee is appointed or before the bankruptcy case is closed. Sears Petro. & Transp. Corp. v. Burgess Constr. Serv., Inc., 417 F. Supp. 2d 212, 225 (D. Mass. 2006).

Both BFP and RML refer to one-year time limitations prescribed in Section 548 of the

Although each of the four elements must be proven, the parties in this litigation focus on the fourth element - whether Debtor received reasonably equivalent value in exchange for the two M&T mortgages on his Home. This fourth element requires two analyses. First, did Debtor get any value in exchange for the Second M&T Mortgage (securing the $250,000 loan) and the Third M&T Mortgage (securing the $400,000 loan)? And second, if Debtor received some value, was the value that he received reasonably equivalent to the value of the two mortgages he gave to M&T?

I accept and agree with PGE's statement that the burden falls on Trustee to prove that Debtor's grant of the two mortgages constituted a fraudulent transfer. Pension Transfer Corp. v. Beneficiaries Under the Third Amendment, etc. (In re Fruehauf Trailer Corp.), 444 F.3d 203, 211 (3d Cir. 2006). See also Fidelity Bond and Mortgage Co. v. Brand, 371 B.R. 708, 716-22 (E.D. Pa. 2007)(detailed analysis of PUFTA, the comments of the committee that drafted PUFTA, and the legislative history as they pertain to the burden of proof). Trustee therefore has the burden of establishing each of the elements required to be proven to avoid a transfer as constructively fraudulent. These elements should be considered in or about the relevant time frame in which Debtor encumbered his Home  – April to June 2007.

---

Bankruptcy Code, 11 U.S.C. §548. PUFTA Section 5109(2), 12 Pa. C.S.A. §5109(2), provides the four-year limitation period.

-40-

Merely because the burden of proof rests with Trustee, however, does not abrogate

Defendants' concomitant obligation to persuade me that Debtor received reasonably

equivalent value for the M&T mortgages. Defendants failed to do that.

## 1. Debtor Had a Substantial Interest in His Home

Although no party makes much of the issue of Debtor's interest in his

Home, the fits and starts and stumbling through which the various transfers of

property occurred highlight the issue of Debtor's interest in the Home. The

testimony is uncontradicted (indeed, the parties stipulated)[56] that the April 25, 2007

transfer of the deed for the Home was effected because Debtor intended to guaranty

the loans from M&T to PGE. The testimony is also uncontradicted, however, that

the family trust had previously promised to give the Home to Debtor upon his

satisfaction of only two conditions: (1) He was to pay all expenses and utilities of

the Home while he lives in it (he had performed this condition in full as of April

2007) and (2) he was to repay the debt his parents owed to Bank of America,[57]

secured by the First BoA Mortgage, which debt was incurred in expanding and

improving the Home. Although Debtor had not defaulted in the repayment of the

---

[56] Joint Statement, ¶22.

[57] In Paragraph 3.c. of Debtor's Statement of Financial Affairs, Debtor denied having made any payments to an insider (his family, including PGE) within the year before his August 2009 petition date. See n. 14, supra, for support of my consideration of Debtor's Statement.

Bank of America loan, he had not yet repaid the full debt to his parents when the

events of 2006 through Spring 2007 arose. Debtor had unilaterally decided to

assume responsibility for $400,000 of PGE's debt used develop the Stacker

technology in 2006. This decision may have compromised his ability to fulfill the

second condition for the transfer of the Home to him, but I heard no testimony about

any such compromise.

From 2000 through his bankruptcy, Debtor had an unchallenged

possessory interest in his Home. Debtor also had a contractual promise from the

family trust that it would convey title to the Home to him when he repaid his

parents' debt owed to Bank of America. Debtor had an equitable interest in the

Home to the extent he had created any of its value through his efforts. At the time

of the initial application to M&T to borrow the money, everyone seemed to believe

that the Home was already titled in Debtor. M&T's title search revealed that the

family trust had not yet conveyed title to Debtor.

In April 2007, Debtor held all legal aspects of owning the Home except

title. Debtor possessed the Home, held an equitable interest in it, and held a

contractual interest in it, all through 2006 when he left PGE into Spring 2007. The

family trust's April 25, 2007 conveyance of title was a mere formality, completing a

-42-

transaction that the parties had long agreed to.[58]  Upon payment of the $160,000 or

so to Bank of America to pay off its loan, the family trust would have been obliged

to convey title for the Home to Debtor.

      I find and conclude that Debtor owned a substantial interest in the

Home, which was consummated on April 25, 2007, when all attributes of ownership

of the Home  −  legal, equitable, and possessory  −  were unified and the family trust

finally conveyed title to him.  Trustee satisfied the first element of Trustee' proof of

a constructive fraudulent transfer:  Debtor held a substantial interest in his Home

when the M&T mortgages were recorded against it.  BFP, 511 U.S. at 535.

## 2.  Debtor Transferred His Interest in His Home Within Four Years Before Debtor Filed His Petition

      Debtor transferred a substantial interest in his Home on April 27, 2007

when he executed the Second M&T Mortgage, mortgaging his Home to secure the

$250,000 debt owed by PGE to M&T.  He also further transferred another

substantial interest in his Home on June 19, 2007, when he executed the Third M&T

Mortgage, mortgaging his Home to secure the $400,000 debt owed by PGE to

M&T.  Trustee's action to avoid the transfer was initiated timely upon the filing by

Debtor of his Chapter 7 bankruptcy on August 14, 2009 and upon the filing by

---

[58] Pennsylvania's Statute of Frauds does not diminish the trust's obligation to convey title to the Home to Debtor.  See pp. 56 - 59, infra.

Trustee of this adversary proceeding on December 29, 2009.   See 12 Pa. C.S.A.

§5109(2); 11 U.S.C. §§ 544 & 546(a); Sears Petro., 417 F. Supp. 2d at 224-25.

Trustee satisfied the second element of Trustee's proof of a constructive fraudulent

transfer:  Trustee filed the complaint well within the four-year period after Debtor's

April and June 2007 mortgages were granted to M&T and well within two years

after the date he was appointed as the trustee.  BFP, 511 U.S. at 535.

## 3.  Debtor Was Insolvent at the Time He Granted the M&T Mortgages on His Home

A debtor is insolvent under PUFTA Section 5102(a) when the sum of

all of his debts exceeds the value of all of his assets.  12 Pa. C.S.A. §5102(a).

Under any balance sheet test, Debtor was insolvent from the time he voluntarily

undertook to pay PGE the $400,000 in Spring/Summer 2006 through the date he

filed his bankruptcy petition.  A list of Debtor's assets and liabilities was provided

to M&T in a May 2007 personal financial statement.  His assets (and their values)

and the amounts of his debts from early 2006 through late 2008 were either listed on

Debtor's personal financial statement or provided through testimony at trial.

PGE granted Debtor the right to use the Stacker technology when he

left PGE in Spring/Summer 2006.  No terms limiting, restricting, or qualifying the

use of the technology by Debtor and SAS from Spring/Summer 2006 through June

2007 were described by any witness or contained in any exhibit. With apparently

free reign, Debtor transferred the Stacker technology to his company SAS in August

2006.

Mr. Weinberg reviewed the 2006 transfer of the technology and the

Stacker orders that PGE gave to Debtor. The transfer of the Stacker orders included

the transfer from PGE of a $300,000 deposit toward the purchase price for the

Stackers. Mr. Weinberg testified, and I agree, that the value to Debtor and SAS of

receiving the $300,000 in 2006 was, at best, Zero, because the obligation to

manufacture and deliver the cash-draining Stackers necessarily accompanied the

deposit.

Mr. Weinberg's entirely credible opinion about the value of the Stacker

technology included his determination that both SAS and the technology were

worthless at all times from 2006 to July 2007. Under any circumstance, the

November 2008 Technology License was inexplicably made retroactive only to July

1, 2007, and therefore does not apply to the period of Spring/Summer 2006 through

June 2007. The entire valuation process by Defendants is tainted by the dates that

critical events occurred. If the Technology License was solely intended to

memorialize the terms by which PGE allowed Debtor and SAS to use the Stacker

technology, it should have dated back to Spring/Summer 2006, when Debtor started

using the technology.  Defendants presented no evidence explaining why the

Technology License related back to a date after the M&T mortgages were granted

and recorded.[59]

A rough breakdown of Debtor's assets and liabilities over time is

helpful in identifying Debtor's insolvency for the critical period of April through

June 2007 when the mortgages were granted.   Through the following compilation

of assets and liabilities, I set forth only the status of who owns the significant assets,

who owes the significant liabilities, and to whom those liabilities are owed.

**(a.) Early April 2007 - Debtor was insolvent**   –   Debtor owned very little

at this time.  Debtor owed the debt of approximately $160,000, secured by the BoA

First Mortgage, to his parents.   They had borrowed the funds from Bank of America

to eliminate their line of credit used by Debtor to improve the Home.  The Bank of

America loan was secured by the First BoA Mortgage on the Home.  He possessed

the Home, but he did not own it.  He would own the Home when he paid the Bank

of America debt in full, if he continued to pay all expenses (utilities, taxes, etc.) of

the Home.  His legally cognizable contractual and equitable interests in the Home at

least balanced out the Bank of America debt.

He owned 100% of newly formed SAS, to which Debtor had assigned

_____

[59] See the prior discussion about the Technology License at pp. 33 - 36, supra.

-46-

his prior interest in the Stacker technology.    As I noted above, I have no evidence that anyone had told Debtor that (1) he could not transfer or assign the Stacker technology to SAS or (2) the use of the Stacker technology by SAS was qualified, limited, or restricted in any way.  When Debtor launched his business as a sole proprietorship producing Stackers, he was given the Stacker technology by PGE, whose attitude appears to have been, "Good riddance!" Nevertheless, use of the Stacker technology put SAS into position to lose a great deal of money with every Stacker unit it manufactured.  SAS, holding the Stacker technology and the ability to manufacture Stackers as its primary asset, was worthless.  Debtor's ownership interest in SAS was worth Zero.   Debtor acknowledged that SAS had Zero value in his May 2007 personal financial statement.

In April 2007, Debtor had retained a $50,000 PGE pension account. Debtor had voluntarily assumed $400,000 of PGE's debt, which obligation tipped the scales negatively resulting in Debtor's insolvent position.

Debtor was insolvent in early April 2007.

**(b.)  April 25, 2007 - Debtor was insolvent** — On April 25, 2007, the family trust conveyed to Debtor full legal title for his Home, encumbered as it was by the $160,000 BoA First Mortgage.   In Debtor's May 2007 personal financial statement

he valued his Home at $520,000.[60]   Debtor continued to own SAS, which had the

interest in the worthless Stacker technology and was worth Zero.  An unpaid

account payable of $128,000 owed to Fromm and guaranteed by Debtor further

exemplified the Zero value of the Stacker technology and SAS  –  SAS could not

pay its debts.   Debtor remained voluntarily responsible for the $400,000 owed to

PGE. Debtor reported in his financial statement that he had not yet drained his

$50,000 PGE pension account and that he had an additional $8,000 available cash.

The $400,000 obligation to PGE, the $128,000 debt to Fromm, and the $160,000

Bank of America debt outweighed the $520,000 Home, worthless SAS, the $50,000

pension, and the $8,000 cash.

Debtor was insolvent on April 25, 2007.

**(c.)  April 27, 2007 (the M&T $250,000 mortgage was put in place),**

**Debtor was insolvent**  –  Debtor owned his Home ($520,000), encumbered by the

BoA First Mortgage ($160,000). Debtor owned SAS (economic value of $0) with

its interest in the Stacker technology. Debtor owed Fromm $128,000.  On April 27,

---

[60] No party actually attempted to value the Home in April 2007 or at any other time than the
stipulated value of $350,000 as of Debtor's Chapter 7 petition date.  Joint Statement, ¶11.  The only
evidence of the Home's value in April 2007 is the $520,000 figure in Debtor's May 2007 personal
financial statement.  Debtor testified that he did not recall filling out any such statement and that he may
have signed a form in blank with the figures inserted later.  This is clearly insufficient evidence to
establish an accurate value for the Home.  For the purpose of determining insolvency, however, it serves
a legitimate function as more or less establishing the value of Debtor's assets and his insolvency.  If I do
not use any figure for the value of the Home, Debtor is even more insolvent.  I therefore use the figure
$520,000 guardedly as a component of the approximation of Debtor's solvency or insolvency.

2007, Debtor provided an accommodation mortgage (the Second M&T Mortgage)

to M&T to secure its $250,000 loan to PGE.    Somehow, Debtor had now become

responsible for securing this additional $250,000, despite his reference throughout

his testimony that he had assumed only $400,000 of PGE's debt.[61]    Because Debtor

seems not to have reduced his stated responsibility to pay $400,000 to PGE, Debtor

had picked up an additional $250,000 secured debt on April 27, 2007.    Debtor had

not drained his $50,000 pension and still had $8,000 cash.    The $400,000

obligation to PGE, plus the Second M&T Mortgage lien on his Home ($250,000),

plus the $128,000 owed to Fromm, plus the $160,000 Bank of America debt

continued to exceed the $520,000 Home, worthless SAS, the $50,000 pension, and

the $8,000 cash.

Debtor was insolvent on April 27, 2007.

**(d.)  June 2007 - Debtor was insolvent**  – Debtor owned his Home

($520,000), encumbered by the BoA First Mortgage ($160,000).    Debtor owed

$128,000 to Fromm.    Debtor owned SAS (economic value of $0) with its interest in

the worthless Stacker technology.    Debtor had provided an accommodation

---

[61] At oral argument on March 12, 2012, counsel for PGE remarked that Ben Scheffler, Debtor's
father, had stated sometime during the trial that Debtor was also responsible for an additional $250,000
owed to PGE.    This argument is misplaced because it does not matter what Ben Scheffler declares or
believes.    Debtor clearly limited his testimony about being responsible to PGE for some debt in the
amount of $400,000.

mortgage to M&T for its $250,000 loan to PGE.  In June 2007, Debtor took on the

Third M&T Mortgage securing M&T's $400,000 loan to PGE.   On June 19, 2007,

Debtor executed a guaranty of the $650,000 debt that PGE owed to M&T and

became personally obligated beyond the value of the Home to M&T.  Debtor's

$400,000 debt owed directly to PGE was not retired  —  Debtor owed and paid to

PGE the monthly debt service payments for the $400,000 loan to PGE.  I have no

evidence whether Debtor had taken funds from his $50,000 pension by this date, so

I will assume the account existed in June 2007.   The $650,000 guaranty, plus the

$128,000 Fromm debt, plus the $160,000 Bank of America debt exceeded the

$520,000 Home, worthless SAS, the $50,000 pension (if the positive balance still

existed), and the $8,000 cash (if the cash still existed).

Debtor was insolvent in June 2007.

(e.)  July 1, 2007 - Debtor was insolvent  —  Although I believe that the

November 2008 Technology License denied, altered, and retrenched from the

outright transfer of the Stacker technology to Debtor and SAS, the parties claim that

it "formalized" the terms of the parties' prior agreement.[62]  If anything, the

Technology License further deteriorated the value of the Stacker technology for

SAS by adding severe restrictions on the previously unlimited permission for

---

[62] The parties' explanation of the scope of the Technology License simply does not ring true.
See discussion at pp. 33 - 36, supra.

Debtor, and then SAS, to use the technology. Nothing changed for the better in Debtor's assets and liabilities.

Debtor was insolvent on July 1, 2007.

Based upon my acceptance of Mr. Weinberg's opinion that the economic value of the Stacker technology and SAS were Zero at all times relevant to this dispute,[63] I find and conclude that Debtor was insolvent from early April before the family trust conveyed title to the Home to him, through the allegedly effective date of July 1, 2007. This, of course, includes the dates on which the M&T mortgages became liens against Debtor's Home. Trustee satisfied the third element of Trustee's proof of a constructive fraudulent transfer: Debtor was insolvent at all times that the transfers of interests in his Home (the M&T mortgages) were made. BFP, 511 U.S. at 535.

## 4. Debtor's Receipt of Reasonably Equivalent Value

Determining whether Debtor received reasonably equivalent value is the next step in resolving this dispute. BFP, 511 U.S. at 535. This last element requires a more or less bifurcated approach in considering assets that might have provided value. First, did Debtor receive any value in or about April and June 2007, in exchange for encumbering the Home with the M&T mortgages? Value includes

---

[63] See discussion at pp. 23 - 30, supra.

any benefit, whether direct or indirect. R.M.L., 92 F.3d at 150. The mere

opportunity to receive value in the future could constitute present value. Id. at 148.

But, based on the circumstances that existed at the time of the transfer, was it

legitimate and reasonable to expect some value accruing to Debtor?   Id. at 152.

Second, if Debtor received at least some value, was the value

reasonably equivalent to the value of the property that Debtor transferred?

Fruehauf, 444 F.3d at 212.  For this aspect of my consideration, I look to the totality

of the circumstances[64] to determine whether Debtor received value that was

reasonably equivalent to the value of the two M&T mortgages on his Home.  The

circumstances include:  (1) The fair market value of the alleged benefit; (2) the

existence of an arm's length relationship between debtor and the transferee; and (3)

the transferee's good faith.[65]  Id. at 213.

**(a.) Any value** – I find and conclude that Debtor received some minute

value in his 2006 opportunity to form and manage his own company that would

manufacture the Stackers through the technology handed over to him by PGE.  I

find some modicum of value in the Stacker technology at that time because it is

---

[64] Consideration of the totality of the circumstances only applies if and after I determine that Debtor received some value.  And then, totality of the circumstances is used to determine if the value to Debtor was reasonably equivalent to the value of the two M&T mortgages.  Fruehauf, 444 F.3d at 212; RML, 92 F.3d at 150.

[65] Trustee does not suggest M&T acted in bad faith and I heard no evidence that would support any such suggestion.

possible, however remote and despite the utter lack of evidence on this issue, that

the cost (including all administrative and production expenses) of producing the

Stackers might eventually have fallen below the price at which they could be sold.

This did not happen, but in Spring/Summer 2006, Debtor's opportunity to run his

own company with the dream of making a profit might constitute value.

But second and more important, Debtor received no value from the

Stacker technology in exchange for the M&T mortgages in April and June 2007.

The technology was given to Debtor a year earlier, in Spring/Summer 2006.  Debtor

used the technology in his immediate and unprofitable production of Stackers as a

sole proprietor.  After he incorporated SAS, he freely transferred the technology to

his new company.  Debtor had unencumbered use of the Stacker technology a full

year before his Home was liened by the M&T mortgages.

Defendant PGE acknowledged in its brief that the Stacker technology

was given to Debtor in Spring/Summer 2006.   PGE further demands that the

Stacker technology be evaluated as of that time, rather than as of April/June 2007.[66]

This argument is wholly inconsistent with Defendants' primary premise – that the

Stacker technology was the value that Debtor received in exchange for and at the

time the M&T mortgages against the Home were granted.  No evidence remotely

_____

[66] The value of the Stacker technology in Spring/Summer 2006 was Zero.  See discussion at pp.
23 - 30, supra.

suggested that encumbering the Home with $650,000 of mortgages in April/June

2007 was connected in any way with the transactions that occurred in

Spring/Summer 2006. The two M&T mortgages, which increased the amount of

Debtor's liabilities and eliminated all equity in Debtor's Home, were simply not

granted in exchange for or related to the 2006 transfer of the Stacker technology to

Debtor and SAS.

Debtor received nothing relating to the Stacker technology in exchange

for the M&T mortgages. The Stacker technology could not constitute any value to

Debtor in exchange for the April and June 2007 mortgages. Nevertheless, I will

complete the analysis and note, alternatively, that the Stacker technology, if it did

give any value, did not constitute reasonably equivalent value for the M&T

mortgages.

**(b.) Reasonably equivalent value** – As I discussed above,[67] I find and

conclude that the Stacker technology did not constitute reasonably equivalent value

for the Second M&T Mortgage and the Third M&T Mortgage encumbering

Debtor's Home in April and June 2007. Trustee successfully proved that the fair

market value of the Stacker technology and the Technology License was Zero at all

times relevant to this constructive fraudulent transfer litigation from 2006 through

---

[67] The value of the Stacker technology in both Spring/Summer 2006 and in April/June 2007 was
Zero. See discussion at pp. 23 - 30, supra.

-54-

2008. Defendants' reliance on the Stacker technology as their defense to Trustee's constructive fraudulent transfer action fails.

**(c.) Value other than the Stacker technology** – Once again, I must engage in the two part approach of searching for value to Debtor from some other source. If I find any, even minimal, value, I will then determine if it is reasonably equivalent to the value of the two M&T mortgages. Fruehauf, 444 F.3d at 212; RML, 92 F.3d at 150.

**(1.) Debtor's Home** – Preliminarily, I note that at no time during the run-up to trial, at trial, or after trial did either Defendant make the case for value going to Debtor other than through the Stacker technology. All references to value were based on that technology. I specifically invited the parties to present, on March 12, 2012, arguments that the transfer to Debtor of title to the Home constituted value to him.[68] Trustee, of course, but also Defendants, declined to refer to the conveyance of title to the Home as having provided significant value to Debtor. Transfer of title appears to have been regarded as unimportant, perhaps because the family members and M&T believed it had been done previously. The family, Trustee's counsel correctly argued, "owed" Debtor the Home already,

---

[68] Although title to the Home was conveyed to Debtor on April 25, 2007, and the mortgages were not in effect until April 27 and June 19, 2007, I conclude that the delay in granting the mortgages is inconsequential to an argument that the events were effectively undertaken in exchange for each other.

pursuant to their agreement with him dating back to 2000.  Defendants disdain

Trustee's argument as running afoul of the Pennsylvania Statute of Frauds, but they

are incorrect.

Concern about the Statute of Frauds is easily ameliorated.  In

Pennsylvania, the law of the Statute of Frauds was codified centuries ago.[69]   Under

its Section 1, an agreement for the sale of real estate may not be enforced unless it is

in writing and signed by the seller.  Hostetter v. Hoover, 547 A.2d 1247, 1250 (Pa.

Super. 1988).  The purpose of the Statute of Frauds is and has been to prevent

perjury and fraudulent claims.  Id.  "As a general rule, the effect of the statute is to

render oral contracts for the sale of real estate unenforceable, although not invalid."

Id.  (Emphasis added.)

In 2009, the Pennsylvania Commonwealth Court reviewed and restated

the requirements to uphold an oral agreement to convey real estate, despite the

Statute of Frauds.  Firetree, Ltd., v. Department of General Services, 978 A.2d

1067, 1074-75 (Pa. Commw. Ct. 2009).  The court noted that a buyer advancing an

oral agreement for the sale of real property must prove four elements:  (1) The terms

of the agreement are full and complete and are satisfactorily set forth; (2) the

---

[69] Act of March 21, 1772, 33 Pa.S. §§ 1 et seq.  The Pennsylvania Statute of Frauds was enacted
before the United States declared independence from Great Britain and has remained in effect
continuously since then.

amount of the consideration to be paid is well-established; (3) the buyer possesses

the property pursuant to the terms of the agreement, openly and notoriously; and (4)

buyer's obligations have been partially or fully performed, thereby making

rescission inequitable and unjust. Id. at 1075. The court refers to a prior

Pennsylvania Supreme Court decision requiring that the above elements of proof

must be established "beyond a doubt." Id. at 1075, citing Kurland v. Stolker, 533

A.2d 1370, 1373 (Pa. 1987).

Furthermore, the rule is well-settled that if the buyer under an oral

agreement for the purchase of real estate expends labor and money to improve the

property, the contract is partly performed and the Statute of Frauds does not apply.

Skiba v. Sipple, (In re Sipple), 400 B.R. 475, 478 (Bankr. W.D. Pa. 2009)(quoting

33 A.L.R. 1489, 1491-92); Hostetter, 547 A.2d at 1251 citing Zlotziver v. Zlotziver,

49 A.2d 779, 781 (Pa. 1946). An oral contract for the sale of real estate will be

enforced when, in addition to taking possession of the property, the buyer has paid

all or a portion of the required payments. Id. Evidence of possession and

substantial improvement is sufficient to take the contract out of the Statute of

Frauds. Id. Evidence of possession and payment of a substantial amount of the

monetary consideration also weighs in the decision to enforce an oral agreement.

Id. All of the above elements of an enforceable oral agreement for the sale of real

estate were satisfied as of April 25, 2007.

The terms of the family trust's agreement to convey the Home to Debtor were clearly and satisfactorily presented in evidence and stand uncontradicted. The Kurland requirement of proof beyond a doubt of the terms and consideration for the property was satisfied. If Debtor paid all costs and expenses for the upkeep of the Home and if he paid the Bank of America debt for the substantial improvements to the Home, the family trust would be legally bound to convey title to the Home to him. The terms were clear and unambiguous and Debtor unquestionably fulfilled them for as long as he could, beginning in 2000 and continuing through April 2007. He possessed the Home, he paid all costs and expenses of the Home, and he had reimbursed his parents for their monthly payments to Bank of America under the terms of the First BoA Mortgage loan. Debtor possessed the Home (open and notoriously), and everyone thought he owned the Home outright. When and if Debtor paid off the $160,000 Bank of America debt, the family trust (his parents) would have been contractually obliged to convey title to the Home.[70]

---

[70] As discussed above, a very rough (and possibly inaccurate) approximation of the value of the Home at this time ($520,000) was in Debtor's May 2007 financial statement. For the purpose of ownership and title of the Home, however, I need not (and cannot) determine the Home's precise value. I need only find, which I do, that Debtor's substantial interests in the Home predated conveyance of legal title on April 27, 2007.

What then occurred on April 25, 2007?  The family trust simply

accelerated conveyance of title to Debtor.  He remained bound to repay Bank of

America (the Home was encumbered by its mortgage).  No other consideration was

required; no other conditions existed.  Debtor did receive some value from the

accelerated conveyance, but the only value was the minimal value of finally having

legal title conveyed to him.  He was already contractually and equitably entitled to

all of the benefits, equity, and emoluments of owning the Home.  Having final legal

title in his name had some value, but it certainly was not value reasonably

equivalent to the loss of all of the equity in the Home when encumbered by the

M&T mortgages.

Counsel for M&T argued that the title and therefore ownership of the

Home provided only minimal value to Debtor because it had already been orally

pledged to be encumbered.   I agree with his point about the value being slight, but

not for the reason he advanced.  Counsel for M&T said the Home was never an

unencumbered asset.  He is incorrect.  M&T referred to stipulated fact No. 22, in the

Joint Statement, which reads:  "At the time [the Home] was conveyed to the Debtor,

he and his parents understood and agreed that [the Home] was to collateralize the

loans by M&T Bank to PGE."  This is very different from arguing that the Home

provided reasonably equivalent value in exchange for the two M&T mortgages.

-59-

The stipulated language does nothing other than establish that the parents intended to accelerate the conveyance of title that they were obliged to convey upon the occurrence of certain expressed conditions.   The stipulated language notes that if they did accelerate that which had been promised and agreed, Debtor would, at some time in the future, encumber the Home with mortgages to M&T.  That is not reasonably equivalent value.

My use above of $520,000 as the value for the Home neither hurts nor helps Trustee and neither hurts nor helps Defendants.  Assuming that the unproven value of $520,000 for the Home, Debtor was insolvent.  Debtor testified that he had no recollection of preparing the May 2007 personal financial statement.  He thought he might have signed it in blank and that some other person completed it.  The evidence is clearly insufficient for me to determine the value of the Home as of that time.  I did not and could not use Debtor's unsupported value of his Home as support for Trustee's Count III (or for any other disputed, substantive issue that might exist).  Whatever the value of the Home, however, Debtor already "owned" its equity (value of the Home less the $160,000 debt secured by the BoA First Mortgage) through his agreement with the family trust (his parents).  This equity interest, whatever the amount[71], was surrendered and lost when the Home was

---

[71] If the Home was worth $520,000, the equity would be $360,000; if the Home was worth $720,000, the equity would be $560,000; and if the Home was worth $360,000, the equity would be

encumbered by the two M&T mortgages, which secured $650,000 of debt.

The value conferred by simple conveyance to Debtor of title to the Home was negligible. Debtor could have initiated an action for specific performance of conveyance of title (if and when he had paid off or refinanced the Bank of America debt) to force the family trust to convey title, thereby giving him the Home. But the de minimis value of the legal title is insufficient to constitute reasonably equivalent value for granting the two M&T mortgages.

Finally, neither Defendant argued that the Home was, in fact, the reasonably equivalent value given to Debtor in exchange for the M&T mortgages. even after I asked them to do so in the March 2012 oral argument. They waived this argument. Alternatively, therefore, I decline to consider either the Home or title to the Home as value that Debtor received in exchange for the M&T mortgages.

Two reasons lead me to conclude that the Home was not reasonably equivalent value received in exchange for the two M&T mortgages: (1) The legal relationships relating to the conveyance of title in the Home resulted in only minimal value, certainly not reasonably equivalent value, being given to Debtor and (2) the decision of the Defendants not to claim/argue that the Home constituted reasonably equivalent value.

---

$200,000. Under any reasonably conceivable value of the Home, Debtor would have had equity in his Home that was extinguished by the two M&T mortgages.

### (2) Encumbering Debtor's Home with the two M&T mortgages –

Defendant PGE argues at pages 9 and 10 of its memorandum of law that having the

two M&T mortgages on Debtor's Home provided value and a benefit to Debtor.  To

the contrary, they benefitted M&T, Debtor's father, his family, and the family

business PGE, but not Debtor.[72]  Before the April/June 2007 loan transactions,

Debtor owed an unsecured $400,000 obligation to PGE.  The M&T loan

transactions added an entirely new creditor to the mix and increased Debtor's

obligation to $650,000, which obligation was secured by his Home.  After the loans

were in place, Debtor continued to owe and pay to PGE the regular monthly

payments that paid down the M&T $400,000 loan, an entirely new, secured

indebtedness.  But now Debtor also owed M&T an additional $250,000 as a

guarantor with a mortgage on his Home.  I reject PGE's argument that Debtor

received value by encumbering his Home to collateralize M&T's loan to PGE.

None of the cases cited by PGE and none of the cases cited for support in 5 Collier

on Bankruptcy, §5-548.03[5], apply to the facts of this dispute, based as it is upon

PUFTA, 12 Pa. C.S.A. §5104.

 Neither title to the Home nor the mortgages securing M&T's loan

---

[72] The two M&T mortgages benefitted Debtor's family and PGE because they secured the loans
for the aggregate amount of $650,000 from M&T to PGE.  Only a bit over $147,000 was needed to pay
off the VIST line, with the balance of the proceeds going into PGE's coffers.  With the two mortgages,
M&T enjoyed additional collateral.

replacing Debtor's former $400,000 obligation to PGE provided reasonably

equivalent value in exchange for Debtor surrendering all of the equity in his Home.

**(d.)  Other elements of reasonably equivalent value** – Although the

analysis above establishes that Debtor received no reasonably equivalent value for

the M&T mortgages, Trustee also proved the second element described in Fruehauf:

The transfers by Debtor were not at arm's length.  Defendants could not refute this

obvious conclusion.  Although the exchange between Debtor and M&T was

between unrelated entities, the entire series of transactions in April and June 2007

was among family members and their businesses.   Debtor's guaranty of PGE's debt

and mortgaging his Home were parts of a series of transactions that was for the sole

direct and indirect benefit of Debtor's family members and PGE, the family-owned

company from which Debtor was then disenfranchised.  The obvious observation

that the transactions were not at arm's length left me with a jaundiced eye,

throughout this opinion, in my review of all other aspects of this dispute, including

the actual value to Debtor of the alleged benefits.

For the third Fruehauf element, I find and conclude that all participants

acted in good faith in all aspects of the transfers occurring in April and June 2007

(this finding is based entirely on the parties' agreement).  This finding of good faith

pales in comparison to the inadequacy of the purported value of that which was

given to Debtor in exchange for the two M&T mortgages.

Using the totality of the circumstances test, I find that Debtor did not receive fair market value reasonably equivalent to that which he gave up, that the transactions were not at arm's length, but that the parties acted in good faith.

# V.  CONCLUSION

Trustee has successfully proved that Debtor's grant of the Second M&T Mortgage and the Third M&T Mortgage were constructive fraudulent transfers.  Trustee established that Debtor transferred a property interest with significant value by mortgaging his Home to M&T to secure his guaranty of two loans in the aggregate amount of $650,000.  The Stacker technology had been given to Debtor, without reserve or limitation, a full year before Debtor's Home was encumbered by the M&T mortgages.  The Stacker technology could not, therefore, constitute any value for the mortgages.  Assuming that the period from Spring/Summer 2006 though April 2007 could be rolled into a single overall transaction, Debtor's ability to run his own business might have constituted some value.  But Trustee also proved that the Stacker technology had Zero economic value.  For these reasons, the Stacker technology provided no reasonably equivalent value to Debtor in exchange for the two M&T mortgages on Debtor's Home in April and June 2007.

Defendants ignored the conveyance to Debtor of title of his Home and therefore waived any argument that the conveyance of naked legal title by the

family trust constituted reasonably equivalent value. Debtor had been faithfully performing all of the required conditions for conveyance of title. The only benefit Debtor received therefore in having title conveyed to him on April 25, 2007, was obtaining title earlier than would have occurred under the terms of his agreement with his parents. In April 2007, Debtor received legal title to join his equitable, contractual, and possessory interests in his Home. Debtor had already enjoyed most of the value of the Home when he got title. For these reasons, neither the Home nor title to the Home provided reasonably equivalent value to Debtor in exchange for the M&T mortgages in April and June 2007.

Furthermore in the totality of circumstances, although all parties acted in good faith, the entire bundle of transactions in April and June 2007 was not undertaken as arm's length events. Debtor had surrendered his right and ability to negotiate any aspect of the loan transaction, incurred an increased liability for $650,000, and secured repayment of PGE's debt to M&T with mortgages on his Home. Every penny of the loan disbursements benefitted other members of his family and PGE, the family's business.

I find and conclude that Debtor's grant of both the Second M&T Mortgage and the Third M&T Mortgage constituted constructive fraudulent

transfers.  I will enter judgment in favor of Trustee and against Defendant M&T[73] in

both Counts I and II.  I will further order that the Second M&T Mortgage and the

Third M&T Mortgage be avoided in their entireties as constructively fraudulent

transfers of Debtor's Home.

Finally, for the reasons stated earlier, I will enter judgment in favor of

Defendant M&T and against Plaintiff Trustee in Count III of the complaint.[74]


BY THE COURT

Date:  June 5, 2012

Richard E. Fehling, U.S.B.J.

---

[73] I had entered judgment on Count III in favor of Defendant PGE by my February 28, 2012
Order.  The only Count against PGE was Count III, so M&T is the only party remaining in this litigation.

[74] See notes 2 and 3, supra.